NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DOUGLAS M. BOYLE and ANTHONY J. GOUVEIA, | **Hon. Dennis M. Cavanaugh** |
| Plaintiffs, | **OPINION** |
| v. | Civil Action No. 05-CV-4463 (DMC) |
| QUEST DIAGNOSTICS, INC., | |
| Defendant. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motions by Defendant Quest Diagnostics, Inc. ("Defendant") for summary judgment as to Plaintiffs Douglas M. Boyle ("Boyle"); and Anthony J. Gouveia ("Gouveia," collectively, "Plaintiffs"). Pursuant to FED. R. CIV. P. 78, no oral argument was heard. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that Defendant's motions for summary judgment are **granted** in part and **denied** in part.

**I.  BACKGROUND**[1]

  A.  Procedural History

A summary of the procedural history of this case can be found in this Court's Opinion dated August 2, 2006. See Boyle v. Quest Diagnostics, Inc., 441 F. Supp. 2d 665 (D.N.J. 2005). On November 5, 2007, Defendant filed motions for summary judgment as to the Plaintiffs'

---

[1] The facts set forth in this Opinion are taken from the undisputed facts set forth in the Parties' FED. R. CIV. P. 56.1 statements in their respective moving papers.

remaining claims under the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 *et seq.*, and claims for common law breach of contract.

      B.    Factual History

On April 2, 2002, Defendant, a publicly-traded company that provides diagnostic laboratory testing, information and services, announced its decision to acquire Unilab Corp. ("Unilab"), one of Defendant's competitors for nearly $1 billion. In its Form 10-Q filed with the Securities and Exchange Commission ("SEC") on October 31, 2003, Defendant stated that upon completion of the Unilab integration, "we expect to realize approximately $25 million to $30 million of annual synergies and we expect to achieve this annual rate of synergies by the end of 2005." (See Bernstein Aff. Ex. D-3.) The term "synergies" refers to the financial effects of combining two companies. "Positive synergies" are the economic benefits a company derives such as increased revenue or decreased costs. "Negative synergies" include increased costs or decreased revenues. (Boyle's Response to Defendant's Statement of Undisputed Facts ¶ 8) (" Boyle SOF".) Defendant also stated, "[t]hese estimates are preliminary and will be subject to revisions as detail integration plans are developed and implemented." (See Bernstein Aff. Ex. D-3.)

Defendant hired Boyle as a Revenue Controller in 1997 as an employee "at will." In late 2002, Boyle agreed to move to California to oversee the integration of Unilab and to assume the position as Vice President of Finance and Administration (the "Agreement"). Under the Agreement, Boyle received a raise, a relocation loan valued at $100,000 and the possibility to earn an additional $260,000 bonus if certain integration targets were met. One of Boyle's duties was to lead the "integration team" responsible for implementing the integration of Defendant's

California operations with Unilab's.

Boyle signed Quarterly Management Representations ("Representations") during the relevant time period he claims that the synergies were inaccurate. These Representations certified Boyle's belief that he was not aware of any violations of federal, state or local laws or regulations. (Bernstein Aff. Ex. D-5 to D-10.) Despite his certifications, Boyle argues that, after the integration with Unilab was finalized and completed, the overstated synergy estimates were never "amended downward even when Quest knew, as an economic certainty, in 2003, that the synergies would never be reached by the end of 2005." (Boyle Opp'n Br., 10.) This, Boyle argues, "is the gravamen of the fraud complained of by Boyle who, as a seasoned accountant and auditor, knew Quest was willfully misleading the public and its shareholders." (Id.)

On May 21, 2003, Boyle discussed his disagreement about the synergy estimates with Dave Zewe, the Senior Vice-President of Operations, Robert Hagemann, the Chief Financial Officer and Ken Freeman, the Chief Executive Officer at Defendant's headquarters located in New Jersey. At the meeting, Boyle stated his belief that Defendant's estimate of $25-$30 million in synergies was unattainable. (Boyle SOF ¶ 29.; Boyle Opp'n Br. 12.) In a meeting on June 4, 2003, Boyle and former Unilab CEO Robert Whalen, then Regional Vice President of Defendant, and Jeff Boschwitz, a consultant with Booz Allen, pointed-out to senior management what they believed to be flaws in the due diligence. (Boyle Opp'n Br., 12; SOF ¶ 31-32.) Boyle believed that the synergy numbers were off by $17 million, $41 million, $24 million and $20 million for the years 2003, 2004, 2005 and 2006, respectively. (Boyle Opp'n Br., 12.) At a subsequent meeting on June 19, 2003, however, consultant Booz Allen gave a second presentation to senior management expressing its view that the $25-$30 million synergy targets were achievable. (SOF

¶ 33.)  Boyle was not present at the June 19, 2003 meeting.  In early September 2003, following Defendant's decision not to adopt Boyle's synergy estimates, Boyle began to complain to management about retaliation, the "corporate bureaucracy" and expressed his desire to move "back east" in a different position with the company.  (Boyle SOF ¶ 35.)

On October 14, 2003, Boyle, Whalen and Paul Rust, then Managing Director of Defendant's southern California area and a member of the Unilab integration team, sent a memo to Zewe, expressing their concern with the synergy estimates.  The letter stated, "[w]hile we fully respect the right of the Company to set these targets and we will work hard to meet them whatever they are, we do feel that full disclosure and our opinions should be given more consideration in this process than they have to date."  (Boyle Dep. Ex. D-15.)  Boyle argues that this letter was sent because he "believed that the failure to disclose the proper numbers was in violation of the law."  (Boyle Opp'n Br. 16.)

Shortly after the attempts by Boyle and others in California to adjust the synergy numbers, Boyle alleges that Defendant took retaliatory action against him:

> He was audited.  He was investigated, allegedly on an anonymous tip.[2]  He was excluded from critical meetings, ostracized from Mr. Hagemann, put through the third degree by Quest's head of security and their assistant counsel, threatened with criminal charges and are [sic] generally harassed. After he specifically complained about the retaliation, an "alleged" investigation was done, the contents of which were never shared with Boyle but which concluded that Boyle had not in fact been retaliated against. Boyle's position at Quest became entirely untenable.

(Boyle Opp'n Br., 26.)  In sum, according to Boyle, the retaliation in question is "more than sufficient to allow a reasonable jury to conclude that he was constructively terminated.  (Id. at

---

[2] The investigation involved Boyle's hiring of his brother as a consultant with Defendant.

4

28-29.)  For several months, Boyle sought other employment and was offered a job with another company on July 8, 2008.  Boyle submitted his letter of resignation on July 12, 2004.  Consistent with an arrangement with his new employer, Boyle offered to remain with Defendant until the end of July 2004.  (Boyle SOF ¶ 50.)  Defendant declined the offer and accepted his resignation effective July 16, 2004.

In 2000, Gouveia was hired as Vice President of Finance and Corporate Controller of Unilab.  Defendant then asked Gouveia to join the company in mid-2003 as Regional Controller.  Gouveia reported directly to Boyle.  (Gouveia Opp'n Br., 4.)  Gouveia was responsible for accounting and finance functions for the California business unit.  As Regional Controller, Gouveia was required to run independent calculations of anticipated profits, losses and other material matters within Defendant.  (Gouveia Opp'n Br., 4.)  Gouveia alleges that, throughout 2004, he complained to high-level management that there were inaccuracies in Defendant's anticipated projections.  (See id. at 5.)

Gouveia claims that he complained to "executive or management personnel at Quest and Booz Allen."  (Gouveia Dep. 157:2-157:13, Sep. 8, 2006.)  Gouveia further alleges that he complained to human resources no fewer than a dozen times in 2004 regarding antagonism he experienced as a result of identifying that Defendant's anticipated disclosures regarding its profits were not accurate throughout 2004.  (Gouveia Opp. Br.,7.)  Most relevant to his CEPA claim, Gouveia claims that one month before he was fired, he refused to sign-off on Defendant's 2004 third-quarter 10-Q report to be filed with the SEC.  (Id. at 5-6.)

5

Defendant contends that Gouveia was terminated for his poor performance. A review of Gouveia's performance began to be reviewed in November of 2003. Defendant's outside auditor, PricewaterhouseCoopers, LLC ("PWC"), identified deficiencies in the accounting for which Gouveia was responsible. The PWC audit reported that unreconciled revenue inexplicably remained unidentified and that the California operation's account closing process seriously lagged behind the process performed by Regional Controllers in other parts of the company. Following the PWC audit, Defendant conducted internal audits and found similar problems with Gouveia's performance. Following these performance reviews, although management sought to terminate Gouveia, Boyle recommended that Gouveia be placed on a performance improvement plan ("PIP"). Boyle subsequently discussed Gouveia's performance issues and submitted an email to Randy Funk, then Defendant's Operations Controller, on February 24, 2004 stating that Gouveia "agreed with the issues and now that his organization was in place he would make sure these issues do not reoccur." (See Funk Certification Ex. 7.) Gouveia alleges that, despite following the PIP and receiving no other negative performance reviews, he was terminated one month after refusing to sign-off on Defendant's Form 10-Q in October 2004, which he alleges to have been fraudulent.

## II.    STANDARD OF REVIEW

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). The moving party bears the burden of

showing that there is no genuine issue of fact. See id. "The burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. See FED. R. CIV. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). "In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the nonmoving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J. 2000), aff'd, 51 Fed. Appx. 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

### III. DISCUSSION

#### A. Breach of Contract Claims

In New Jersey, one's employment status is presumed to be "at-will" and therefore, terminable at any point in time at the will of either party, except where termination is "statutorily proscribed or contrary to a clear mandate of public policy." Schlichtig v. Inacom Corp., 271 F. Supp. 2d 597, 603 (D.N.J. 2003) (citing Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 397 (1994)). When the terms of an employment agreement make the "at will" status of an employee clear, a plaintiff's breach of contract claim is defeated. See Keene v. Sears Roebuck & Co., Inc.,

No. 05-0828, 2007 WL 2701992 at *5 (D.N.J. Sept. 10, 2007).

In the current case, Gouveia proceeds with his CEPA claim but does not proceed with his breach of contract claim. (Gouveia Opp'n Br. 1.) Defendant moves for summary judgment on Boyle's breach of contract claim. In the Complaint, Boyle alleges that Defendant wrongfully and constructively terminated him. (Compl. at ¶ 25.) Further, Boyle argues that employment conditions became intolerable because he could not involve himself "with the false synergy figures and the fraudulent booked goodwill, which Quest refused to amend or revise." (Boyle Opp'n Br., 30.) Boyle further points to continuing retaliation against him. Boyle argues that he relied on Defendant's offer for him to move to California to oversee Unilab's and that specific figures for his integration bonus would be established within reasonable time. According to Boyle, the Agreement is a question of fact for a jury to determine "for purposes of the contract claim." (Boyle Opp'n Br., 31.)

Defendant argues for summary judgment because Boyle was an employee at-will, and even if there was an Agreement, Defendant did not breach its January 23, 2003 employment agreement with Boyle. First, Defendant points to language in the January 23, 2003 employment agreement, which states that "[t]he only binding contract between you and the Company is the Employee Agreement contained on the Company's application." The application, signed by

8

Boyle, concomitantly states that Boyle understood:

> [T]hat I may terminate my employment at any time and for any reason, with appropriate notice to the Company. I also understand that the Company may terminate my employment at any time and for any reason which the Company deems to be in its best interests, consistent with all applicable laws and regulations."

(cited in Boyle SOF ¶ 2.) Second, Defendant argues that there was no breach of the January 23, 2003 employment agreement. As stated above, the Agreement set forth Boyle's at will status with Defendant. Further, the Agreement stated only that Boyle would be eligible for an integration bonus if he met certain criteria. Specifically, the letter provides, "you will be eligible for an integration bonus based on achieving key integration goals including synergy targets. Should the business achieve these targets, you will be eligible for a target bonus payment of $260,000 to be paid in the first quarter of 2005." (Bernstein Aff. Ex. 12.) Defendant argues that Boyle is not entitled to any bonus because the company did not reach its integration targets and Boyle left the company six months before the date when it would be paid. (Def.'s Br. 10).

This Court finds that Defendant has satisfied its burden on Boyle's breach of contract claim. The undisputed facts show that Boyle was an employee at will, integration targets were not met, and Boyle resigned in July 2004.

In New Jersey, "where the terms of the contract are clear, the court must enforce it as written." Gross v. Lasko, 338 N.J. Super. 476, 486 (App. Div. 2001). The unattainability of the integration targets is not relevant to Boyle's breach of contract claim. Eligibility of an integration bonus does not entitle Boyle to that bonus when integration targets were not met and where Boyle left the company months before he would have become eligible for the bonus. This

9

Court will not read a cause of action for a breach of contract where the terms of employment were clear. The retaliation claims are relevant for purposes of Boyle's CEPA claim, and not for his breach of contract claim. Therefore, this Court will grant Defendant's motion for summary judgment as to Boyle's breach of contract claims.

    B.    <u>CEPA Claims</u>

In New Jersey, under CEPA, it is illegal for an employer to "take any retaliatory action against an employee because the employee:"

> . . . c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including *any violation involving deception of, or misrepresentation to, any shareholder, investor*, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;
>
> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment."

N.J.S.A. 34:19-3 (emphasis added). The purpose of CEPA is to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." <u>Abbamount v. Piscataway Bd. of Educ.</u>, 138 N.J. 405, 431 (1994). Therefore, CEPA should be considered "remedial" legislation and should be construed liberally to effectuate its important social goals. <u>See</u> <u>id.</u>

In order to prevail on a CEPA claim, a plaintiff must establish that (1) he or she reasonably believed that his or her employer's conduct was violating a law or rule or regulation promulgated pursuant to law; (2) he or she objected to the conduct; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistleblowing activity and the adverse employment action. See Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 404 (3d Cir. 2007) (citing Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)).

When a plaintiff brings a CEPA claim, the plaintiff or the court must "identify a statute, regulation, rule, or public policy that closely relates to the complained of conduct." Sarnowski v. Air Brooke Limousine, Inc., No. 03-493, 2005 WL 3479685 at *3 (D.N.J. Dec. 20, 2005) (citing Dzwonar, 177 N.J. at 463). The plaintiff has the burden of proving that he or she held an objectionably reasonable belief that such a violation has occurred. See id. If a plaintiff fails to carry the burden the court must enter judgment for the defendant. Therefore, on summary judgment in a CEPA claim, "the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy . . . If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief." Dzwonar, 177 N.J. at 465-66.

In the current case, Plaintiffs allege that Defendant retaliated against them for complaining about activity they believed to be in violation of the SEC's disclosure requirements, namely Defendant's overstatement of synergies on Form 10-Q SEC filings. Defendant moves for summary judgment as to Boyle since he was not retaliated against, he left Defendant voluntarily,

11

and he did not reasonably believe that the synergy numbers were overstated in contravention to any law, statute or public policy. Defendant moves for summary judgment as to Gouveia since he was terminated for his poor performance and not in retaliation to complaints.

Finally, Defendant argues that Plaintiffs are estopped from arguing that they complained of conduct in violation of the law since both Plaintiffs signed Representations, certifying their belief that they were not "aware of any violations of federal, state, or local law or regulation, which could have a material impact on the company." (Def.'s Br. for Gouveia, 3; Def.'s Br. for Boyle 18.) This Court will determine each of Defendant's motions separately.

        1.     Boyle's CEPA Claims

Although Boyle points to no specific violation of any law, rule or regulation to show the first element of his CEPA claim, Boyle argues that he justifiably believed that Defendant was required to amend its synergy estimates and its booked goodwill. Boyle claims that, as a CPA, CMA, controller and auditor, he knew that Defendant "was keeping its stock artificially high by lying to the shareholders about synergies it knew it could never achieve." (Boyle Opp'n Br., 26.) Additionally, Boyle argues that he complained about Defendant overstating its "booked goodwill" in its Form 10-Q for October 2003. In sum, Boyle argues that Defendant was "engaged in fraud on its shareholders and Plaintiff quite simply tried to stop them." (Boyle Opp'n Br. 25.)

To support the second element of his CEPA claim, Boyle points to the following whistle-blowing activity to support his CEPA claim: (1) the May 21, 2003 meeting with management in which he informed them of material misstatements in the synergy numbers; (2) the June 4, 2003

12

business review with management and outside consultant Booz Allen in which he and others highlighted specific due diligence problems; (3) the October 6, 2003 meeting with Zewe in which Boyle "expressed his concerns over the budget. . . (and) refused to submit an unachievable and bogus budget;" (4) the letter dated October 14, 2003 sent from Boyle and others to management again stating their disagreement with the due diligence figures for the synergy numbers; (5) the January 13, 2004 lunch meeting with Freeman in which Boyle raised "disclosure issues." (Boyle Opp'n Br., 17.)

For the third element of his CEPA claim, Boyle argues that Defendant retaliated when it audited, investigated, excluded him from critical meetings, ostracized, threatened him with criminal charges and generally harassed him so that his position with Defendant became "untenable." (Boyle Opp'n Br., 26.)

For the fourth and final element of his CEPA claim, Boyle argues that Defendant retaliated against him as a consequence for him objecting to Defendant's policy of keeping its stock artificially high by misstating synergy and goodwill. Ultimately, Boyle claims that he was constructively discharged.

This Court is not persuaded that a reasonable jury could find that Boyle has met any of the above listed elements of his CEPA claim. For Boyle to defeat Defendant's motion for summary judgment, he must show a "substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff." Dzwonar, 177 N.J. at 463. The record undercuts Boyle's contention that he had a reasonable belief that Defendant's conduct of misstating the synergy numbers violated a law, rule or regulation. The record does not support

13

the correlation made by Boyle of complaints about overstated synergies and investor fraud in violation of securities regulations. At the time he complained about the synergies, Boyle's closest reference to illegal activity is his October 23, 2003 letter referred to "full disclosure." This letter, however, also stated Boyle's willingness to achieve synergy numbers that he now complains were stated illegally. Thus there is not adequate evidence to establish a substantial nexus between the complained of conduct and a law or public policy. Further undercutting his claim of reasonable belief are the Representations signed by Boyle that stated his belief that Defendant was not engaged in activities in violation of the law. Notably, Boyle signed one such certification on October 6, 2003, shortly before he wrote a letter complaining about the misstatements of the synergy numbers. Therefore, at the outset, Boyle's CEPA claim fails.

As to the second element, Boyle and others objected to the synergy numbers by way of meetings with upper-level management and a letter dated October 14, 2003. These complaints however cannot be considered "whistle-blowing activity" since they make no reference to violations of the law. Specifically, the letter to Zewe states:

> I have always viewed a Budget as something that one considers reasonable and attainable. These (synergy) numbers are neither in our view. . . [w]hile we fully respect the right of the Company to set these targets and we will work hard to meet them whatever they are, we do feel that full disclosure and our opinions should be given more consideration in this process than they have to date.

(Bernstein Aff. Ex. D-15.) This letter makes no indication that Boyle believed the statement of synergies to be in contravention of any law, or a rule or regulation promulgated pursuant to law. In fact, Boyle's expression of Defendant's right to "set these targets" and to "work hard to meet them whatever they are" eliminates any doubt that Boyle was not complaining about conduct that

14

he believed to be illegal.  Boyle claims that Defendant violated the law by "willfully misleading the public and its shareholders." (Boyle Opp'n Br., 10.)  CEPA requires a close relationship between a plaintiff's claims and a law, rule, regulation, or clear mandate of public policy. See Dzwonar, 177 N.J. at 467.  No such relationship exists between Boyle's complaints and securities laws.

As to the third element, Boyle's claims of retaliation and constructive discharge fall short of actionable.  First, Boyle's salary actually *increased* during the time period in which he alleges he was retaliated.  (Boyle Dep. 250:14-251:5, April 7, 2006).  Retaliation in the CEPA context "requir[es] an employer's action to have either impacted the employee's 'compensation or rank' or be virtually equivalent to discharge' in order to give rise to the level of retaliatory action required for a CEPA claim."  Caver v. City of Trenton, 420 F.3d 243, 255 (3d Cir. 2005) (citing Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 46 (App. Div. 2005)).  Neither Boyle's compensation nor his rank were adversely affected.  Even if Boyle was in fact intimidated in a corporate investigation of the hiring of his brother, excluded from meetings that he cannot show took place, and told that "people get fired for doing what he did", none of those actions rises to the level required for a CEPA claim.

Second, in a constructive discharge, a plaintiff must allege "conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it."  Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 28-29, (2002) (citing Jones v. Aluminum Shapes, Inc., 339 N.J.Super. 412, 428 (App. Div. 2001)).  More precisely, the standard envisions a "sense of outrageous, coercive and unconscionable requirements." Id.  Boyle was unhappy with his

employment with Defendants, he sought employment on the east coast and resigned when he was offered a position at another company. "In a constructive discharge situation, a violation occurs at the point where a reasonable employee is compelled to resign due to the employer's action. *At that point, the employer has engaged in a retaliatory action.*" Dewelt v. Measurement Specialties, Inc., No. 02-3431, 2007 WL 542234 at *5 (D.N.J. Feb. 16, 2007) (original emphasis). Here, Boyle sought employment at another firm for several months prior to resigning. Further, Boyle admitted his willingness to stay with the company, even for an additional two weeks following his resignation. (Boyle SOF ¶; 50.)

### 2. Gouveia's CEPA Claims

Gouveia alleges that he took whistle-blowing activity in October of 2004, when he refused to "sign off" on Defendant's third quarter 10-Q SEC filing. Specifically, Gouveia claims that he was "asked to sign off on the third quarter 2004 Q, a footnote, that stated we had synergy from 25 to 30 million . . ." (Gouveia Dep. Tr. p. 198:20-22.) Gouveia alleges that he refused because the disclosures in the report were not accurate and he would not lie by signing the inaccurate 10-Q report. (Gouveia Opp'n Br., 6.) In response to his refusal, Gouveia argues, Defendant retaliated a month later by terminating him.

As to the first element of his CEPA claim, Gouveia claims that he reasonably believed that he was concerned about fraudulent conduct on the part of Defendant towards investors. To support his position, Gouveia states that "public harm is presumed with investor fraud." The record, however, does not support Gouveia's contention that he believed that the inaccurate synergies and profit forecasts constituted investor fraud. In an October 11, 2004 email to Funk,

16

Gouveia submitted his projected synergies at $23.6 million for 2005 and $34 million in projected synergies for 2006. (Funk Cert. Ex. 3.) The difference between Gouveia's projections for 2005 and Defendants projections the same year are less than two million dollars in a one billion dollar acquisition. A reasonable juror could not find that Gouveia believed a one and a half million dollar misstated synergy estimate in a one-billion acquisition of Unilab would constitute "investor fraud," particularly when his synergy estimate for the following year exceeded Defendant's estimates by four million dollars. As already stated, CEPA requires a substantial nexus between the complained of conduct and a law or public policy. See Dzwonar, 177 N.J. at 163. Gouveia can cite to no other instance in which he complained of conduct constituting investor fraud. Since Plaintiff cannot meet the first element of his CEPA claim, Defendant's motion for summary judgment must be granted.

Gouveia also fails to show that a reasonable jury could find that Gouveia could prevail on the fourth element of his CEPA claim; a causal connection between his refusal to sign off on the Form 10-Q and retaliation by Defendant. Standing alone, the discharge one month after refusing to sign off on a fraudulent SEC filing may establish a triable fact under a CEPA claim. Several factors, however, undercut causation. First, there is no evidence that Gouveia was required to sign off on the statement. Second, the synergy numbers were not even reported in the Form 10-Q that Gouveia declined to "sign off" on. Therefore, Gouveia's claim of causation must fail.

Gouveia argues that the temporal proximity between his complaint and his discharge is dispositive. Specifically, Gouveia cites Dewelt to show that refusing to sign off on Defendant's misstated Form 10-Q and subsequent termination create an issue of fact for the jury. (Gouveia

17

Opp'n Br., 20-21.)  Dewelt, however, is distinguishable.  In Dewelt, the plaintiff, Chief Financial Officer of the defendant company, refused to sign a 10-Q that overstated the assets of the corporation; a fact which defendant conceded.  See 2007 WL 542234 at *2-3.  The court denied the defendant's motion for summary judgment, recognizing the possibility that the plaintiff was constructively discharged when he faced the choice of signing a false SEC statement or being demoted.  See id. at 3.  Here, Gouveia does not allege that he was required to sign off on the Form 10-Q as a condition of employment.  Further, notwithstanding the *de minimis* disagreement in the synergies, unlike in Dewelt, the figures that Gouveia alleges were misstated are disputed by Defendant and its independent consultant, Booz Allen.  Therefore, summary judgment will be grated as to Gouveia's CEPA claim.

        C.        Defendant's Motion for Summary Judgment as to Relocation Loans

Defendant also moves for summary judgment as to its counter-claim against Boyle for breach of contract for amounts due on two relocation loans granted to Boyle.  In 1999, Boyle was given a $50,000 relocation loan by Defendant.  In 2003, Boyle was given a $100,000 loan to relocate to his new position in California.  The relevant terms of the 1999 loan agreement are as follows: (1) Defendant agreed to loan Boyle $50,000.00 for a period of five years;  (2) Defendant agreed to forgive the loan in $5,000 increments on the following dates: December 1, 2000; December 1, 2001; December 1, 2002; December 1, 2003; and December 1, 2004.  Boyle agreed to repay the loan in annual amounts of $5,000;  (3) Finally, the agreement stated that Boyle would owe the remaining balance of the loan if Boyle terminated employment with Defendant.  At that point, the loan would accrue interest at a rate of ten percent per year.  Since Boyle

resigned from Defendant in July of 2004, $20,000 of the loan was forgiven pursuant to the terms of the loan agreement. Further, Defendant claims that Boyle paid his portion of the loan worth $20,000, therefore, owing Defendant $10,000 of the balance plus interest. Boyle however contends that $25,000 of the loan was forgiven by the clear terms of the agreement.

The 2003 loan for $100,000 had similar forgive and repayment provisions. The agreement stated that the $100,000 loan would be forgiven in one-third increments on December 31, 2003, December 31, 2004, and December 31, 2005. The agreement also stated that Boyle, upon termination, would owe the remaining balance at a rate of ten percent per year. The agreement also contained a provision that would forgive the loan if Boyle was eligible for benefits under the Quest Diagnostics Severance Plan ("Severance Plan").

Defendant argues that Boyle owes Defendant a total $10,000 plus interest for the 1999 loan and $66,666.66 plus interest for the 2003 loan. This Court finds that a question of fact remains on Defendant's counter-claim for amounts due under the relocation loan. Specifically, Boyle argues that he paid or was forgiven the amount of $45,000 under the 1999 loan and that the terms of the 2003 loan forgave the balance of the loan because Boyle was entitled to benefits under the Quest Diagnostics Severance Plan. The record does not establish whether Boyle was entitled to employee benefits under the Severance Plan. Therefore, Defendant's motion for summary judgment as to its counter-claim against Boyle for breach of contract is **denied**.

### IV. CONCLUSION

For the reasons stated, it is the finding of this Court that Defendant's motion for summary judgment is **granted** in part and **denied** in part, such that summary judgment as to Boyle's Breach

of Implied Contract and CEPA claim is **granted**; summary judgement as to its counter-claim against Boyle for amounts due under the Relocation Agreement is **denied**; and summary judgment as to Gouveia's CEPA claim is **granted**.  An appropriate Order accompanies this Opinion.

                                     S/ Dennis M.Cavanaugh
                                      Dennis M. Cavanaugh, U.S.D.J.

Date:       May  29 , 2008
Orig.:      Clerk
cc:         All Counsel of Record
              Hon. Mark Falk, U.S.M.J.
              File